## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JACQUELINE N. PADILLA,

Plaintiff,

vs.                                                             Civ. No. 04-916 WJ/DJS

WEST LAS VEGAS INDEPENDENT SCHOOL DISTRICT,
WALTER ADAMS, in his individual capacity,
AMBROSE CASTELLANO, in his individual capacity,
PATRICK MARQUEZ, in his individual capacity,
RALPH GARCIA, in his individual capacity,
MICHAEL VIGIL, in his individual capacity,
ARTURO GURULE, in his individual capacity, and
FRANK ARGUELLO, in his individual capacity,

Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## BASED ON QUALIFIED IMMUNITY

THIS MATTER comes before the Court upon Defendants' Motion for Summary

Judgment, filed September 26, 2005 (**Doc. 46**).  Plaintiff Jacqueline Padilla ("Padilla" or

"Plaintiff") is the former Director of the West Las Vegas School District Head Start program.

Plaintiff claims that immediately after she discovered and reported corruption and program

deficiencies in the Head Start program, she was the target of harassment and retaliation by

Defendants, resulting finally in her termination.  The complaint alleges gender discrimination

under Title VII based on unequal pay as compared to a male predecessor and successor;

retaliation based on protected speech and also free association under the First Amendment; and

violations of her Plaintiff's rights under the Equal Protection clause of the Fourteenth

Amendment.  Defendants' summary judgment motion moves for dismissal based on qualified

immunity for only Plaintiff's First Amendment retaliation claim and her Equal Protection claim. Having considered the parties' briefs and the applicable law, I find that Defendants' motion is well-taken and will be granted with regard to Plaintiff's Equal Protection claim but is otherwise denied.

## Background[1]

Head Start is a federally funded program providing early childhood education, meals, family services and health care to low income children ages three to five throughout the United States.  Each community's Head Start program is administered through a local grantee organization that receives the federal funds, administers the program and accounts for the use of those funds.  During the time relevant to this case, Defendant West Las Vegas School District ("WLVSD") was the grantee responsible for administering the Head Start program serving low income children throughout Las Vegas and San Miguel County, New Mexico.  Plaintiff was employed pursuant to contract as Head Start Director with WLVSD for the 2002-03 school year.

Plaintiff had concerns regarding the operation of the Head Start program, which she expressed to School Board President Walter Adams ("Adams"), Chairman of the School Board, by memo dated February 21, 2003.  The concerns included illegal functioning of the Policy Council and ineligible participants in the program.  Adams did not receive the February 21, 2003 memo until April 4, 2003, when Plaintiff opened the memo for him on his computer.  On April 4, 2003, Plaintiff told Adams that the concerns needed to be straightened out or Plaintiff would turn

---

[1]  The Court accepts Defendants' statement of material facts ("SMF") as undisputed, since Plaintiff fails to respond to any of them specifically as required under D.N.M.L.R.-Civ. 56(b) (nonmovant "must state the number of the movant's fact that is disputed").  Instead, Plaintiff presents eight pages of her own "Material Facts" concerning her First Amendment and Equal Protection claims, which Defendants rebut in the reply.

the program over to the federal authorities.

At the April 10, 2003 school board meeting, School Superintendent Barbara Perea Casey was reassigned from her position as Superintendent to Assistant Superintendent.[2]   At the executive session of that meeting, Plaintiff discussed her concerns about fraudulent activities with the board members and Superintendent Gurule.

As of April 11, 2003, Plaintiff sent a letter to Lu Yazzie at the Administration for Children and Families at the Department of Health and Human Services ("HHS") because she had not received the cooperation from the school board to make the changes she felt were needed to the Head Start program.

It is undisputed that Adams did not receive the February memo until April 4th (since Plaintiff has not responded to Defendants' statement of material facts), and that Plaintiff expressed her concerns at the April 10th executive session of the school board.  However, Plaintiff counters these facts with some evidence that Adams knew about Plaintiff's concerns regarding the irregularities in the Head Start program before February 2003 – as early as January. Barbara Perea Casey ("Casey"), who was still superintendent before April 2003, states that Padilla informed her sometime in December 2002-January 2003 that Padilla and her staff had begun to uncover fraudulent and illegal activity in the program. Plaintiff told Casey she had discovered that

_____

[2]  Ms. Casey is a plaintiff in a companion case suing the same defendants for reasons similar to those of Ms. Padilla, alleging that Defendants retaliated against her for investigating and reporting abuse and corruption in Defendants' handling of the Head Start program.  The presiding judge in that case, Magistrate Judge Alan Torgerson, recently granted defendants' motion for summary judgment on Ms. Casey's Title VII and Equal Protection claims, but denied the motion with regard to plaintiff's First Amendment retaliation claim.  See Civil No. 04-1157 ACT/DJS, Doc. 46.   Ms. Casey's deposition which is presented as Plaintiff's Exhibit 4 in this case was taken in Casey's own lawsuit against Defendants.

as many as 50% of the families enrolled in the Head Start program may have falsified their applications because they had incomes that were too high to be in the program, and that two of the five parents on the Head Start Policy Council were employees of the grantee/school district, which was against federal regulations.  Casey stated that she relayed Padilla's concerns to Adams "immediately after" Padilla told her.  Pltff's Ex. 4 at 52:23-25; at 188.  Defendants object to statements made by Casey in her affidavit about Plaintiff's reporting the deficiencies, characterizing these statements as inconsistent with Casey's deposition testimony.  The Court finds no merit to this objection, as both Casey's affidavit and deposition testimony state that Plaintiff approached her in the December-January period.  Pltff's Ex. 3 (Casey Aff.), ¶ 7; Pltff's Ex. 4 at 52:15.  The Court also rejects Defendants' other challenge to this testimony based on a lack of specificity as to the exact date Plaintiff approached Casey (see reply, ¶ 6A), since the exact date is not material.

Padilla also contends that she also had conversations with Adams that pre-dated the February 21, 2003 memo, and that she sent Adams the memo both by hard copy and e-mail several times during February and March 2003.  Pltff's Ex. 2 at 144-145 ("ongoing conversation [with Adams] since October"); Pltff's Ex. 2 at 138; Ex. 2 at 180 (since March through informal conversations between Plaintiff and Adams); Pltff's Ex 2 at 138 (Adams knew from January through e-mail "conversations").[3]

On April 21, 2003, Jesus Lopez was retained as attorney for the West Las Vegas School Board.  Plaintiff met with Defendant Gurule and Attorney Lopez ("Lopez") and provided them

---

[3]  Defendants express some concern for hearsay remarks made by Padilla to Casey. However, this concern does not apply to statements which Casey testifies she made to Defendants in her affidavit, or to statements Defendants allegedly made to her, under Fed.R.Evid.801(d)(2).

4

copies of what she believed to be fraudulent applications to the Head Start program.  Lopez told

Plaintiff that the information should not go any further.

Padilla does not dispute that Lopez told her the information should go no further.  Pltff's

Ex. 2 at 108:4-6.  However, Padilla adds other facts which are supported by deposition testimony.

She states that at a meeting with Gurule and Lopez which took place around April 13th, either

Gurule or Lopez told Padilla that she was not to speak to the federal government about her

concerns.  Both Gurule and Lopez were present at that meeting.  Pltff's Ex. 2 at 172.  Casey

stated in her deposition that she spoke to the board in executive session about the need to take

corrective action with the Head Start program, but was told to "[l]eave it alone.  Just don't go

there."  Pltff's Ex. 4 at 51:20-25.

In May 2003, while still employed for the school district, Plaintiff provided copies of the

applications given to Defendant Gurule and Lopez to the FBI.  As a result, an audit was

conducted by HHS of the Head Start program on May 19-23 and June 16-20, 2003.  Because of

the audit, a demand for payment of $526,000 was made to the West Las Vegas School District.

Deft's Ex. 12 (letter to Adams dated August 8, 2003).  An appeal from HHS's demand was filed

by WLVSD.

The federal investigation into WLVSD's Head Start program also resulted in a letter to

the board members dated August 22, 2003, which found the program to be in noncompliance with

federal requirements, including misuse of finds, inadequate supervision of children, undue political

influence, family favoritism, and intimidation and harassment of staff and parents.  Pltff's Ex. 6.[4]

_____

[4] Defendants raise a hearsay issue with regard to the letter of noncompliance sent by HHS
and dated August 8, 2003.  Defendants concede that HHS found that the Head Start program was
not in compliance during the time was the Director, but challenge the letter insofar as it is being

On May 8, 2003, Plaintiff's contract was not renewed.

Several months later, in October 2003, the WLVSD was served with a search warrant and documents were seized related to the Head Start program.  The appeal by WLVSD is still pending.  Defendants point out that the seizure of documents pursuant to the search warrant has hindered the administrative appeal regarding HHS's demand, because those documents are not in the possession of the WLVSD.

### Legal Standard

When a defendant raises a claim of qualified immunity, the burden shifts to the plaintiff to show the defendant is not entitled to immunity.  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  In a qualified immunity inquiry, only after the Court determines whether a plaintiff  has alleged a deprivation of a statutory or constitutional right at all, does the Court consider whether that right was clearly established at the time so that reasonable officials would have understood that their conduct violated that right. County of Sacramento v. Lewis, 523 U.S. 833, 841, n. 5 (1998); Trotter v. The Regents of the Univ. of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000).

Only after the plaintiff has met this burden must the defendant bear the usual summary judgment movant's burden of showing that no material issues of fact remain that would defeat his or her claim of qualified immunity.   McFall v. Bednar, 407 F.3d 1081, 1087 (10th Cir. 2005)

---

used for factual support for Plaintiff's response to the summary judgment motion.  The Court notes the hearsay problem in taking the content of the letter as support for factual allegations regarding the program's actual deficiencies, and does not make any determinations herein based on the truth of the violations asserted within that letter.

**Discussion**

As mentioned above, Defendants move for summary judgment only on Plaintiff's First Amendment retaliation and Equal Protection claims.

**I.      First Amendment Retaliation**

A government employer may not, as a condition of employment, compel an employee to relinquish carte blanche his or her First Amendment right to comment on matters of public concern. See Pickering v. Board of Educ., 391 U.S. 563, 568 (1968), cited in Maestas v. Segura, 416 F.3d 1182,1187-88 (10th Cir. 2005).  Such employer, however, is not constrained from altering an employee's conditions of employment for legitimate reasons.

1.      To prevail on a claim of retaliation in the free speech context, the employee must establish (1) the speech involved a matter of public concern, (2) the employee's interest in engaging in the speech outweighed the employer's interest in regulating the speech, and (3) the speech was a "substantial motivating factor" behind the employer's decision to take an adverse employment action against the employee. Maestas, 416 F.3d at 1187 (citing Baca v. Sklar, 398 F.3d 1210, 1218-19 (10th Cir. 2005) and Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)).  If the employee establishes these three factors, he or she wins unless (4) the employer establishes it would have taken the same action in the absence of the protected speech.  Id., 416 F.3d at 1187 (citation omitted).

The first two factors present questions of law. The latter two factors address causation and present questions of fact subject to the preponderance of the evidence standard.  Maestas, 416 F.3d at 1188 (citations omitted).   Defendants' summary judgment motion does not address

7

these last two factors, and addresses only qualified immunity under the first two factors.

When applying a qualified immunity analysis to a First Amendment claim, the Court must determine (1) whether Plaintiff's speech addressed matters of public concern, and (2) whether the protected nature of speech was sufficiently clear that Defendants should have known the interest of the employer would not survive a balancing inquiry.  Patrick v. Miller, 953 F.2d 1240, 1246 (10th Cir. 1992).

A.      Whether Plaintiff's Speech is Protected

Speech is protected under the First Amendment when the speech relates to matters of public concern, and when the balancing inquiry weighs in favor of the employee.  Lee v. Bd. of Cty. Commissioners of Arapahoe Cty, Colo et al., 18 F.Supp.2d 1143, 1157 (D.Col. 1998).

Defendants list five instances of speech which they claim are alleged by Plaintiff to be protected:

1.      April 4, 2003 statement to Defendant Adams;

2.      April 10, 2003 statement in executive session to school board and Defendant Gurule;

3.      April 11, 2003 letter to Yazzie (signed as program director)

4.      meeting with Defendant Gurule and Attorney Lopez where Plaintiff provided copies of what she believed to be fraudulent applications to the Head Start program;

5.      May 2003 meeting with the FBI while employed for the school district.

Plaintiff emphasizes that her reports of illegal Head Start enrollments were made to Defendants over a period of months, and were not limited to the above instances.  Plaintiff has provided some evidence that Adams was aware of Plaintiff's reports from as early as October in

"ongoing conversations" between Plaintiff and Adams, and thus the Court will consider these as instances of alleged protected speech.   Plaintiff also refers to reports made "first to Defendant Arguello" and then to Adams.  Resp. at 14.  However, except for this unsupported assertion in the text of the response, there are no facts supporting any report or complaint made by Plaintiff to Arguello in Plaintiff's statement of facts, nor in any evidence relied on by Plaintiff.  The assertion itself contains no description of date(s), context or content of any such statement and will therefore not be considered by the Court in a First Amendment analysis.

       2.      Defendants first argue that Plaintiff's speech is exempt from a protected status because they were statements made in the course of her employment.  This argument is not applicable here.  Communications made in the course of an employee's official duties are not per se exempted from First Amendment protection.  Koch v. City of Hutchinson, 847 F.2d 1436, 1442 (10th Cir. 1988). The fact that the speech at issue occurred during or as a part of an employee's official duties is but one consideration in a First Amendment inquiry.  Id.  Here, Plaintiff's reports appear to be more than what would normally be considered as part of her job.  According to Plaintiff's version, she made these reports on a repeated basis, expecting Defendants to implement measure to bring the program into compliance.

Defendants then contend that Padilla's statement were not of public concern and therefore are not protected because Plaintiff's statements were "at least careless and could be characterized as reckless."  Mem. at 10.  The Court rejects this argument as well.  Viewing the evidence favorably to Plaintiff, her reports and complaints were made only after she and her staff conducted

9

an investigation into the irregularities and deficiencies in the Head Start program.  This, plus the

fact that the program was the subject of some scrutiny by federal authorities, precludes a finding

that Padilla's statements were deliberately or recklessly false.  Cmp., Dill v. City of Edmond, Okl.,

155 F.3d 1193, 1202 (10th Cir. 1998) (where defendants did not show that plaintiff knew or

should have known his statements were false, court concluded that plaintiff satisfied threshold

public concern requirement).

  Turning to the traditional threshold part of the analysis, the next question is whether

Plaintiff's speech, listed above (and including other reports made to Adams on an ongoing basis),

touched on matters of public concern.  To determine whether employee speech touches on a

matter of public concern, we look at whether it can "be fairly considered as relating to any matter

of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146

(1983). This examination requires analysis of the "content, form, and context of a given

statement, as revealed by the whole record." Id. at 147-48. When the content of the speech

focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a

matter of public concern.  Wulf v. City of Wichita, 883 F.2d 842, 857 (10th Cir.1989) (citations

omitted).  Conversely, speech is generally not protected if the aim is simply to air grievances of a

purely personal nature.  Id. The pertinent inquiry is whether the actor is speaking as a citizen or an

employee. Connick, 461 U.S. at 147; Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir. 1990).

  The reports by Plaintiff concerning alleged illegal enrollments in the Head Start program

and alleged illegal functioning of the Policy Council clearly "concern information in which the

public would definitely be interested." Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988).

The content of these statements of potential wrongdoing alleged the misuse of public funds.  The

context of these reports was not limited to a private matter between Plaintiff and Defendants, or merely address internal policies, but was primarily for the purpose of informing the board of what Plaintiff perceived to be improper and illegal conduct.  Thus, the Court finds that Plaintiff's speech at issue – reports and statements made to Defendant Adams and the school board, Plaintiff's letter to Yazzie, Plaintiff's meetings with Gurule and Lopez and later with the FBI – touch on matters of public concern.

B.       Balancing Inquiry

As the Court has found that Plaintiff's speech involves a matter a public concern, the Court must next "balance the employee's interest in commenting upon matters of public concern against the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees."  Dill, 155 F.3d at 1201.  "Speech is protected if the employee's interest outweighs the interest of the employer."  Id.  Factors to be considered include: the manner, time and place of the employee's expression. . . the context in which the dispute arose. . . [and] whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impeded the performance of the speaker's duties or interferes with the regular operation of the enterprise.  Barker v. City of Del City, 215 F.3d 1134, 1139 (10th Cir. 2000).

The Court notes that the Defendants have a heavier burden when the speech constitutes whistle blowing. When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight when he or she is acting as a whistle blower in exposing government corruption.  Conaway, 853 F.2d at 797.  Speech that

seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests.  Conaway, 853 F.2d at 797.  The Court finds that Padilla's speech can be characterized as whistleblowing, since her speech involved allegations regarding impropriety on the part of the board members.

Defendants advance two arguments which they feel should tip the Pickering scale in their favor: (1) that Plaintiff's actions reflect upon her competence to perform her job; and (2) that Plaintiff's actions caused a disruption to the school district.  The Court rejects both of these arguments.  Defendants contend that because Plaintiff waited only one day after notifying her supervisor (Gurule) of her concerns before forwarding them to HHS (the letter to Yazzie), Plaintiff's competence is called into question.  However, there is no evidence presented by Defendants which would suggest Plaintiff's incompetence in her duties as Head Start Director.  Further, Plaintiff has presented evidence that at least Walter Adams knew for months about the illegal enrollments and illegal functioning of the Policy Council, long before Plaintiff presented her concerns to the board at the executive session on April 10th.

With regard to Defendants' contention that Plaintiff's reports caused disruption to the school district, Defendants offer no evidence of this sufficient to prevail in the balancing inquiry.  The Tenth Circuit rejects the view that whistleblowing which results in disharmony in the workplace weighs favorably for the employer.  In Conaway, the Tenth Circuit recognized the anomaly of holding that a whistle-blowing employee could not "speak out on his perception of potential improprieties or department corruption" because the speech "might jeopardize the harmony of the office or tarnish the integrity of the department."  Conaway, 853 F.2d at 797-78.  Rather, such disruptions are foreseeable consequences of a public official who questions the

12

integrity of those who administrate their government.  Id. (citations omitted).  This view was clearly established when Plaintiff's speech was made.

Defendants also urge the Court to consider Plaintiff's speech as instances of multiple speech requiring separate balancing inquires, because the speech resulted in two different types of disruption.  They argue that in the balancing inquiry, Plaintiff's competence at her job should be balanced against the particular disruptions associated with each instance.  Defendants include in the first instance of speech the April 4, 2003 and April 10, 2003 reports made to Adams and the school board, as well as the April 11, 2003 letter to Yazzie at HHS which Plaintiff wrote because she felt she had not received cooperation from the school district regarding her concerns.  As a result of this speech, the WLVSD was subjected to an audit, fines and an administrative appeal. The second instance of speech, in Defendants' view, was Plaintiff's contact with the FBI in May 2003 after being told by Gurule and Lopez that the information she provided should go no further.  The disruption Defendants associate with this speech is a criminal investigation that still may be ongoing two years later.[5]

Factors that could be considered in determining whether speech consists of separate instances, or is interrelated include: the time frame in which the speech occurred, the different audiences to which the speech may have been directed, the continuity of the speech, and the degree to which the different aspects of speech built upon each other to create a cumulative impact on the state employer.

I find that Plaintiff's speech did not consist of multiple instances of speech.  In this case,

_____

[5]  Defendants do not include information concerning this investigation, or even the fact that a *criminal* investigation was initiated, in their statement of facts.

the "separate" instances of speech took place within a relatively short time period - within a month or so.  Cmp, e.g., Kurtz v. Vickrey, 855 F.2d 723 (11th Cir.1988) (district court's decision to separate speech affirmed where speech occurred over many years concerning different subjects of varying degrees of importance), cited in, Johnsen v. Independent School Dist. No. 3 of Tulsa County, Okl. 891 F.2d 1485, 1492 (10th Cir. 1989).  Also, Plaintiff's speech cannot be described as targeting two different audiences: the first instance of speech, as categorized by Defendants, included both the school board and the HHS, a federal agency.  At any rate, even if Padilla's statements could be segregated according to audience, the speech addressed the same subject with the same objective in mind.  It was a "concerted, cohesive campaign on a single subject," and as such, Plaintiff's speech should be considered in its entirety for purposes of the Pickering balancing test.  Id. at 1492-93.

Even if the Court were to conduct separate inquiries for each instance of what Defendants consider to be separate speech, it would make no difference in the ultimate analysis.  Defendants contend that in the first instance of speech, Plaintiff's competence in making the reports and writing the letters should be weighed against her because one day is an unreasonable time frame in which to expect a response under the circumstances of this case.   However, even if the Court were to conduct a separate balancing inquiry here, the analysis would favor Plaintiff, since, as mentioned above, Plaintiff presents evidence that the time frame could have been months, and not days, in which she waited for Defendants to take appropriate action to correct the deficiencies she had discovered.

In the second instance of speech (to the FBI), Defendants contend that Plaintiff's competence in her speaking to the FBI should weigh against her because she had been directed by

14

the school attorney not to take the matter any further.  Here again, a separate balancing inquiry would not gain Defendants any advantage, because it would weigh in Plaintiff's favor.  Statements made by Defendants to Plaintiff as well as Casey, according to her sworn testimony, could be taken to indicate an intention to procrastinate action on the program's deficiencies, particularly when viewed in the context of attempts which were allegedly made previously by Plaintiff to direct Defendants' attention to them.  See, e.g.: Pltff's Ex. 4 at 51:23-24 (Adams statement to Casey: "Leave it alone. Just don't go there"); Pltff's Ex. 4 at 54 (Adam's statement to Casey: "Don't worry about it - we'll talk about it"); Pltff's Ex. 2 at 172 (Plaintiff told not to speak to the federal government by either Lopez or Gurule); Pltff's Ex. 2 at 108:5-7 (Lopez telling Plaintiff that the information was "not to go any further").

Accordingly, in addressing the balancing factors of the <u>Pickering</u> analysis, the Court finds that Plaintiff's speech was constitutionally protected.  Because the nature of Plaintiff's speech was sufficiently recognizable as whistle-blowing, and the protected status of such speech was clearly established at the time of Defendants' alleged retaliation, it is sufficiently clear that Defendants should have known that their interest as the employer would not survive a balancing inquiry.  Therefore, Defendants' are not entitled to qualified immunity on Plaintiff's First Amendment claim, and that claim will proceed to trial.

**II.     Equal Protection Claim**

In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000), the United States Supreme Court noted that equal protection claims brought by a "class of one" have been recognized where a plaintiff does not allege membership in a class or group, but rather that she has been intentionally treated differently from others similarly situated and that there is no rational basis for

15

the difference in treatment (citations omitted).

Defendants contend they are entitled to qualified immunity on Plaintiff's Equal Protection claim because the law regarding the "class of one" theory on which Plaintiff bases this claim was not clearly established law in May 2003 when Plaintiff was terminated.

A.     Whether the Law Was Clearly Established

The law is clearly established when the contours of the alleged right is sufficiently clear such that a reasonable official would understand that what he is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987).  To show a right is clearly established, there must be Supreme Court or Tenth Circuit law on point, or the weight of authority from other courts must support the Plaintiffs proposition. Armijo v. Wagon Mound Public Sch., 159 F. 3d 1253, 1260 (10th Cir. 1998).

Defendants' position is that the law is not clearly established in "class of one" theories brought in an employment context.  There is some merit to this position.  The unequal treatment in the factual scenario in Willowbrook concerned the Village of Willowbrook requiring a larger easement for the plaintiff compared to other similarly situated property owners.  Defendant also cites to one unpublished opinion addressing a "class of one" theory addressing an employment context decided before May 2003, Smith v. Eastern New Mexico Medical Center, 72 F.3d 138 (Table) (10th Cir. 1995) (equal protection claim was stated where surgeon and his nurse wife alleged intentional acts of invidious discrimination intended to drive them out of practice and out of the community).  Defendants correctly note that an unpublished decision cannot form the basis for clealy established law on this issue.

Plaintiff cites to a Seventh Circuit and Second Circuit case with a "class of one" equal

protection claim, one decided before May 2003, and the other decided after May 2003 but recognizing the law as clearly established prior to that time.  However, neither of those cases dealt with employment issues:  Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995) (plaintiff alleged denial of liquor license due solely to vindictive campaign by mayor); Cobb v. Pozzi, 363 F.3d 89 (2d Cir. 2004) (corrections officers alleged that they were disciplined in retaliation for association with union, in violation of First Amendment and denial of equal protection).  Further, two cases from other circuits are clearly not on point, nor do they constitute a "weight of authority from other courts."

However, Plaintiff also points to a Tenth Circuit case, Bartell v. Aurora Public Schools, 263 F.3d 1143 (10th Cir. 2001) which did involve employment issues and was decided prior to the time period for the underlying facts in this case. The plaintiff in that case, a school employee, alleged an equal protection violation arising out of the investigation of sexual harassment charges filed against him on the theory that school district officials singled him out for persecution due to some animosity on their part.  His claim failed because his allegations were insufficient to show a spiteful intent on the part of defendants, and because the school had bee presented with colorable allegations of sexual discrimination by a credible complainant.

The Bartell case could arguably support Plaintiff's position in this case that the law was established regarding Defendants conduct in an employment context, although the Court questions whether one Tenth Circuit case addressing similar issues constitutes *clearly* established law.[6]  See, e.g., Mimics, Inc. vs. Village of AngelFire, 394 F.3d 836, 850 (10th Cir. 2004) (in case

---

[6] As Defendants point out, the Honorable Bruce Black had similar doubts about the application of the "class of one" theory to an employment context.  See, Viarreal v. City of Espanola, Civil No. 02-1319 BB/WDS (D.N.M., November 21, 2003 [Doc. 101 at 10-11 ]

involving commercial lessees suing building inspector and  village officials for warrantless and

nonconsensual entries into their business premises, qualified immunity for defendants was affirmed

in part where Tenth Circuit case held that specific type of equal protection claim advanced by

plaintiffs was not clearly established).

However, I need not decide whether the law was clearly established with regard to

Plaintiff's Equal Protection claim based on a "class of one" theory.  Plaintiff cannot prevail on this

claim because she has not met the first prong of a qualified immunity analysis, which I turn to

next.

B.      Was Plaintiff Similarly Situated?

Plaintiff's first hurdle in the qualified immunity analysis is to demonstrate the violation of a

constitutional right.  Siegert v. Gilley, 500 U.S. 226, 232 (1991).     To clear this hurdle, Plaintiff

must produce some evidence that she was intentionally treated differently from those who were

similarly situated.  See, Village of Angel Fire, 394 F.3d at 848-49 (noting that plaintiffs were

required to prove that they were treated differently than those similarly situated).

Plaintiff refers to three school employees in order to show that Defendants protected or

attempted to protect these employees from discipline despite their offenses and/or infractions of

school policy.  Plaintiff cannot rely on these situations for her Equal Protection claim because

none of these employees can be considered to be similarly situated to her, either in their job

position or in the alleged infractions committed.  One employee was school principal who had an

affair with a female teacher in his school, where the teacher was fired but no disciplinary action

_____

(questioning whether the Tenth Circuit would recognize "class of one" theory in employment
context involving employment disputes over promotion, a raise, unpleasant treatment by a
supervisor and payment of accrued annual leave).

was taken against the principal.  <u>See</u> Pltff's Ex. 4 at 92-93.  Another employee was a cook who refused to perform certain duties of her job, and who was not disciplined because she was allegedly having an affair with Defendant Garcia.  Pltff's Ex. 4 at 30-31.  The third employee, who was a cousin of Defendant Castellano, made "discos" on school time using school materials and then sold them for personal profit, but was never disciplined even after Castellano was informed of his cousin's conduct.  Pltff's Ex. 4 at161-62.

Plaintiff presents "material facts" which she contends are evidence of Defendants' ill-will and differential treatment toward her, such as: verbal harassment. refusal to provide a reason for Plaintiff's termination when requested, "stripping" Plaintiff of her authority by telling her she was not to discipline her staff; and statements allegedly made by Marquez that he was "going to get rid of that bitch" (referring to Plaintiff).[7]

While these allegations may be relevant to retaliatory actions under Plaintiff's First Amendment claim, which is proceeding to trial, they are not relevant to her Equal Protection claim, since Plaintiff is required to show she is similarly situated to other employees.  She has not done so, either with regard to her job position or any alleged infraction committed.  The employees identified by Plaintiff do not occupy a job position remotely similar to Plaintiff's position, nor has Plaintiff demonstrated that they are subject to the same standards governing performance evaluation and discipline.

There is some mention in the complaint regarding unequal pay for Plaintiff at the time she

---

[7]  I make no findings here on whether any of these allegations are either admissible or have merit.  For example, Defendants dispute Marquez' alleged comments and challenges them as hearsay.  While I agree that statements made by Marquez to Plaintiff's secretary, who then made them to Plaintiff, constitute hearsay, these statements have no bearing on my findings regarding the issues addressed in this Memorandum Opinion.

was hired, specifically that she was paid $1,000 less per year than her predecessor.  However, Plaintiff has not named as defendants in this action either Barbara Casey who recommended the hiring to the board (Casey was school superintendent when Plaintiff was initially hired), or Pete Ortega who was a board member approving the contract.  Thus, this claim cannot form the basis of an Equal Protection claim either.

Thus, Plaintiff cannot sustain an Equal Protection claim, even assuming the law is clearly established in that area.  See Hennigh v. City of Shawnee,155 F.3d 1249, 1257 (10th Cir.1998) (dismissing plaintiff's equal protection claim where plaintiff failed to show treatment different from those similarly situated).

**Conclusion**

In sum, Plaintiff has demonstrated that she engaged in speech which survives a Pickering balancing inquiry and which is constitutionally protected by the First Amendment.  Defendants are not entitled to qualified immunity on Plaintiff's First Amendment claim because the law was clearly established such that Defendants would reasonably know their alleged conduct would not survive the balancing inquiry.  Plaintiff's First Amendment claim thus survives summary judgment based on the parties' pleadings.

However, Plaintiff's Equal Protection claim does not survive Defendants' summary judgment motion.  The Court's qualified immunity analysis did not proceed to a determination as to whether the law was clearly established on this claim because Plaintiff failed to present evidence that there were other employees who were similarly situated to her.  Accordingly, Defendants are entitled to qualified immunity on Plaintiff's Equal Protection claim because Plaintiff has not alleged a violation of a constitutional right.

20

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 46)**.

is hereby GRANTED IN PART and DENIED IN PART, in that:

(1)     Defendants' motion is DENIED with regard to Plaintiff's First Amendment claim

for the above stated reasons;

(2)     Defendants' motion is GRANTED with regard to Plaintiff's Equal Protection

claim for the above stated reasons.

_____

UNITED STATES DISTRICT JUDGE